**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

GINA STYRING,

     Plaintiff,

v.                                                                                    Civ. No. 25-400 GJF/DLM

CITY OF CARLSBAD,

     Defendant.

**MEMORANDUM OPINION AND ORDER ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**ON PLAINTIFF'S TITLE VII AND EQUAL PROTECTION CLAIMS**

THIS MATTER is before the Court on *Defendant City of Carlsbad's Motion and Memorandum in Support for Summary Judgment for Plaintiff's Title VII Violations, New Mexico Human Rights Act Violations, and Violation of the Fourteenth Amendment Equal Protection Clause Under Section 1983 Claims* (Dkt. No. 83) ("Motion"). The Motion is fully briefed. *See* Dkt. No. 93 (response); Dkt. No. 101 (reply). The Court heard oral argument on May 1, 2026 ("Hr'g").[1] *See* Dkt. No. 124.

As explained herein, the Court concludes that Plaintiff has failed to present sufficient evidence to create a genuine issue of material fact that Defendant discriminated against her based on her gender. In addition, because this conclusion resolves Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's New Mexico Human Rights Act ("NMHRA") and New Mexico Whistleblower Protection Act ("NMWPA") claims. Accordingly, the Court **GRANTS** the Motion to the extent that it **DISMISSES** Plaintiff's Title VII and Section

---

[1] The Hr'g citation refers to an audio recording of the May 1, 2026 Motions Hearing stored on the Court's Liberty system. Neither the audio recording nor a transcript is currently available on CM/ECF; however, any party may obtain the recording through the Court's records department and have it transcribed.

1983 claims, and **REMANDS** her state claims to the Fifth Judicial District Court, Eddy County, New Mexico.

## I.   INTRODUCTION

This case arises from Plaintiff's termination as a dispatcher with the Carlsbad Police Department, which Plaintiff asserts was due to her gender and protected statements she made at a December 2024 union meeting. Dkt. No. 1-1. In her Complaint, Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I), the New Mexico Human Rights Act ("NMHRA") (Count II), the New Mexico Whistleblower Protection Act ("NMWPA") (Count III), and the Equal Protection Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 (Count V).[2]  In the instant Motion, Defendant addresses only Plaintiff's claims under Title VII, the NMHRA, and the Equal Protection Clause, arguing that Plaintiff lacks either direct or circumstantial evidence of gender discrimination and seeking summary judgment in its favor on Plaintiff's Counts I, II, and V. Defendant addresses Plaintiff's claim under the NMWPA (Count III) by separate motion. *See* Dkt. No. 81.

## II.   FACTUAL BACKGROUND[3]

Beginning in June 2022, Plaintiff was employed as a dispatcher by the Carlsbad Police Department ("CPD"). Def.'s Mot. for Summ. J., Undisputed Material Fact (hereinafter "Def.'s UMF") ¶ 1, Dkt. No. 83. During her employment with CPD, whether as a dispatcher or dispatch supervisor, Plaintiff was a member of the Carlsbad Police Officers Association ("CPOA"), a union that represents police officers, dispatchers, records clerks, and animal control. Def.'s UMF ¶¶ 2–

---

[2] Previously, the Court granted the parties' Joint Motion to Dismiss Plaintiff's Equal Protection claim (Count IV of her Complaint) against individual defendants Wendy Austin and Jessie Rodriguez. Dkt. No. 109.

[3] The facts that follow are construed in Plaintiff's favor and either affirmatively admitted or not "specifically controverted" with competent evidence by Plaintiff. *See* D.N.M. LR-Civ. 56.1. For disputed or allegedly unsupported facts, the Court cites to the underlying exhibits and other materials in the record, as necessary. *See* Fed. R. Civ. P. 56(c)(3) ("The court need only consider the cited materials, but it may consider other material in the record.").

3. In early December 2024, she attended by telephone a CPOA meeting at which she voiced complaints about Katey Prell's performance as Dispatch Commander. Dkt. No. 83, Ex. 1, at 43:1–19.

### A. Prell's Informal Investigation

The next month, in early January 2025, Dispatcher Cassi Parker reported to another Dispatch Supervisor, Melissa Phillips, that information was circulating through the CPD dispatch department related to alleged misconduct on and off duty involving Plaintiff and CPD Officer Omar Lopez, including a rumor that Plaintiff and Lopez had sex in the police department bathroom. Dkt. No. 83, Ex. 4, at 73:25–76:21; Dkt. No. 83, Ex. 3, at B.1. Phillips approached Dispatch Commander Katey Prell with this information, and Prell in turn informed then-Deputy Chief Danny Garrett about the circulating rumors. Dkt. No. 83, Ex. 3, at B.1. Next, Prell conducted an informal investigation, interviewing multiple CPD employees concerning rumors of Plaintiff's misconduct. Dkt. No. 83, Ex. 3, at B.1–B.2.

According to Prell, another Dispatch Supervisor, Samantha Luna, reported hearing Lopez admit to having sexual relations with Plaintiff in the second-floor bathroom at CPD, though Luna did not have tangible evidence or firsthand knowledge of such conduct. Dkt. No. 83, Ex. 3, at B.1–B.2. Prell also reported that Cassi Parker "stated that she was told directly by Officer Omar Lopez that he did in fact have an inappropriate relationship[] with [Plaintiff], but [he] stated that he was drunk and regretted it." Dkt. No. 83, Ex. 3, at B.2.

Upon completing her informal investigation, Prell wrote a memorandum concluding that Plaintiff may have engaged in professional misconduct and recommended that an internal affairs ("IA") investigation be opened so that CPD's Professional Standards Division could investigate

more thoroughly. Def.'s UMF ¶ 8. Prell then turned the investigation over to Deputy Chief Garrett. Def.'s UMF ¶ 8.

### B. Defendant's Internal Affairs Investigation

On January 16, 2025,[4] Police Chief Jessie Rodriguez instructed Lieutenant Adrian Rivera to initiate an IA investigation into allegations of inappropriate "courting behavior" between Plaintiff and Officer Lopez. Def.'s UMF ¶ 9. During the investigation that followed, Rivera interviewed multiple CPD employees, four[5] of whom reported that Lopez admitted to them that he had sexual relations with Plaintiff.[6] Dkt. No. 83, Ex. 3, at A.2, A.4, A.6, A.7, A.15. Two of these employees, Ciera Samaniego and Amairani Valles, claimed that Lopez specified that he had sex with Plaintiff in the CPD second-floor bathroom, whereas Cassi Parker and Juan Murillo reported that Lopez did not provide details about where the sexual encounters occurred. Dkt. No. 83, Ex. 3, at A.2, A.4, A.6, A.15.

During the investigation, Samaniego did not mention to Rivera who was present with her at the November 2024 party when Lopez allegedly admitted to having sex with Plaintiff in the CPD bathroom. Pl.'s Resp. to Def.'s Mot. for Summ. J., Additional Statement of Undisputed Material Fact (hereinafter "Pl.'s AUMF"), Dkt. No. 93 ¶ I; Dkt. No. 83, Ex. 3, at A.4. Samaniego later testified at her deposition, however, that Mario Rocha, Frankie Martinez, Juan Murillo, and

---

[4] As Plaintiff observes in her response (and Defendant does not dispute), Chief Rodriguez's letters to Lieutenant Rivera in which he tasked Rivera with investigating the rumored misconduct by Plaintiff and Lopez are misdated as "January 16, 2024," when in fact the investigation was launched in *2025*. *See* Dkt. No. 93 at 15 n.9.

[5] According to Rivera's report, Cassi Parker, Ciera Samaniego, Amairani Valles, and Juan Murillo each reported that Lopez confessed that he had sexual relations with Plaintiff. *See* Dkt. No. 83, Ex. 3, at A.2 (Cassi Parker), A.4 (Ciera Samaniego), A.6 (Amairani Valles), A.7 (Juan Murillo), A.15 (Cassi Parker).

[6] According to Rivera's report, CPD employees had different accounts of where and when Lopez's admissions occurred. Valles and Parker both reported that Lopez made admissions in the dispatch room with both of them and Murillo present. Dkt. No. 83, Ex. 3, at A.6, A.15, A16–A.17. Samaniego reported that Lopez made the admissions at a party in November 2024. *Id*. at A.4. As for Murillo, he did not specify where or when Lopez's admissions took place. *Id*. at A.7.

Amairani Valles were present in her kitchen at the November 2024 party, when either Murillo or Rocha began pressing Lopez about whether he had sex with Plaintiff in the CPD bathroom. Pl.'s AUMF ¶ J; Dkt. No. 93, Ex. B.2, at 60:20–61:10. Samaniego further testified that Lopez "didn't really answer the question. He just – just ignored it and kind of kept going." Pl.'s AUMF ¶ J; Dkt. No. 93, Ex. B.2, at 63:3–64:6. Similarly, Valles reported to Rivera that she was at an off-duty get together when "guys" from work asked Lopez for details about the rumors concerning him and Plaintiff, but Lopez did not respond. Dkt. No. 83, Ex. 3, at A.6. In sum, despite multiple other CPD employees being present at the November 2024 party, only Samaniego reported that Lopez admitted to having sex with Plaintiff in the CPD bathroom (Pl.'s AUMF ¶ K; Dkt. No. 83, Ex. 3, at A.4), and she later contradicted that claim by stating that Lopez "didn't really answer the question" about what occurred in the bathroom (Dkt. No. 93, Ex. B.2, at 63:3–64:6). As for Valles, she told Rivera that Lopez admitted to having sex with Plaintiff in the CPD bathroom but claimed that admission took place in the CPD dispatch room with Cassi Parker, Juan Murillo, and herself present. Dkt. No. 83, Ex. 3, at A.6, A.16.

Rivera interviewed Plaintiff and Lopez separately. Def.'s UMF ¶ 12. He told Plaintiff that he "needed to prove" the allegations against her "were just rumors," and he explained that he was not interested in her personal life or her conduct while off-duty. Pl.'s AUMF ¶¶ C, D; Dkt. No. 83, Ex. 3, at A.10. During their interviews, both Plaintiff and Lopez denied having sexual intercourse with each other, but admitted that they had exchanged sexually explicit photos. Def.'s UMF ¶ 12; Dkt. No. 83, Ex. 3, at A.10–13, A.17, A.21. According to Plaintiff, she sent intimate pictures of herself to Lopez via Snapchat in March or April 2024. Pl.'s AUMF ¶ A. Plaintiff also admitted that she and Lopez discussed having sex, but she denies following through. Def.'s UMF ¶ 13. Plaintiff insists that her communication with Lopez ceased in May 2024. Pl.'s AUMF ¶ A.

As the IA investigation continued, and given the conflicting statements of the interviewees, Rivera advised Plaintiff and Lopez that he intended to recommend to Chief Rodriguez that they each undergo polygraph examinations to assist with determining the truth of what transpired. Def.'s UMF ¶ 14; Dkt. No. 83, Ex. 3 at A.21–23. After Rodriguez authorized the administration of polygraphs on Plaintiff and Lopez[7] (Dkt. No. 83, Ex. 8, at 172:21–173:21), Rivera wrote a letter to polygrapher Matthew Olenik that provided some background on the investigation. Dkt. No. 93, Ex. B.3, at 1. Rivera told Olenik that both Parker and Valles recalled that Lopez admitted to having sex with Plaintiff on CPD premises. Pl.'s AUMF ¶ L; Dkt. No. 93, Ex. B.3 at 1. According to Rivera's report, however, Lopez had not provided Parker details of where any sexual encounters with Plaintiff occurred. Pl.'s AUMF ¶ L; Dkt. No. 83, Ex. 3, at A.2, A.15.

On February 20, 2025, Rivera notified Plaintiff that, as part of the IA investigation, she was being directed to participate in a polygraph examination, which had been scheduled for five days later. Def.'s UMF ¶ 17. Plaintiff responded that she would not submit to a polygraph because she considered it unfair to her. Def.'s UMF ¶ 17; Dkt. No. 83, Ex. 3, at A.23–A.25. Rivera warned Plaintiff that refusing to submit to a polygraph would be construed as a refusal to cooperate with the investigation and could lead to disciplinary consequences, including possible termination. Def.'s UMF ¶ 18. Nevertheless, Plaintiff persisted in her refusal to take the polygraph. Def.'s UMF ¶ 19; Dkt. No. 83, Ex. 3, at A.24. Plaintiff also reported to Rivera that Amairani Valles had been discussing details of the investigation, including with former Officer Mario Rocha, who was no longer employed by CPD. Dkt. No. 83, Ex. 3, at A.24, A.25. Plaintiff also told Rivera that Valles was "supposedly highly intoxicated at [a November 2024] party and tried sleeping with multiple officers but was supposedly turned down by them." Dkt. No. 83, Ex. 3, at A.25. Plaintiff attributed

---

[7] Although Rodriguez testified that requiring polygraphs was his idea, he also testified that it was up to Rivera to decide to whom those polygraphs were administered. Dkt. No. 93, Ex. B.1, at 13:18–14:1, 175:8–176:11.

the allegations of sexual misconduct against her and Lopez to Lopez having rejected Valles's sexual advances. Dkt. No. 83, Ex. 3, at A.24. Plaintiff also explained that she understood from her conversations with Rocha that Valles did not want her to get away with the alleged misconduct with Lopez on a technicality. Pl.'s AUMF ¶ G; Dkt. No. 83, Ex. 3, at A.25.

Around the same time, Rivera notified Lopez that he, too, was being ordered to participate in a polygraph examination as part of the IA investigation. Def.'s UMF ¶ 20. Like Plaintiff, Lopez responded that he would not submit to the polygraph. Def.'s UMF ¶ 20. Although Rivera informed Lopez that such a refusal could result in severe discipline, including termination, Lopez still refused. Def.'s UMF ¶ 21. According to Rivera's report, Lopez told him that he felt as though he was "being drug under the bus because Amairani [Valles] got rejected by him at a party and because she has an issue with Styring." Pl.'s AUMF ¶ G; Dkt. No. 83, Ex. 3 at A.27. Lopez added that he felt the investigation was already compromised and that the rules had been broken due to revenge. Pl.'s AUMF ¶ G; Dkt. No. 83, Ex. 3, at A.27. Rivera asked Lopez why he did not discuss Valles's alleged personal vendettas against him and Plaintiff during their first two interviews, noting that it would have been critical to the investigation. Pl.'s AUMF ¶ G; Dkt. No. 83, Ex. 3, at A.27. Lopez explained that he only elaborated on the specific questions he was asked during those interviews. Pl.'s AUMF ¶ G; Dkt. No. 83, Ex. 3, at A.27.

On or about February 24, 2025, a CPOA representative informed Rivera that Lopez had changed his mind and *would* submit to a polygraph examination. Def.'s UMF ¶ 22. Two days later, Rivera concluded the IA investigation into Plaintiff's alleged misconduct, leaving open the investigation into Lopez's alleged misconduct pending the results of his forthcoming polygraph. Def.'s UMF ¶ 23. In his findings, Rivera determined that both Plaintiff and Lopez were deceitful and that Plaintiff had violated CPD policies governing cooperation with investigations, sexual

misconduct, and professional standards of conduct, whereas Lopez had violated CPD policies governing sexual misconduct and professional standards of conduct. Def.'s UMF ¶ 25.

The CPD policy related to internal investigations, which Rivera found Plaintiff violated, provides that CPD employees must cooperate with investigations, including submitting to a polygraph if the Police Chief "[c]onsiders the circumstances to be extraordinary" or "[b]elieves the integrity of an employee is in question." Def.'s UMF ¶ 24; Dkt. No. 83, Ex. 9, at B.1, B.5. The same policy also provides that failing or refusing to cooperate with an investigation subjects a CPD employee to disciplinary action. Def.'s UMF ¶ 24; Dkt. No. 83, Ex. 9, at B.1.

Rivera testified that he ultimately determined that the allegations against Plaintiff were sustained based on her refusal to submit to a polygraph and based on statements by other CPD employees concerning the allegations against her. Def.'s UMF ¶ 26; Dkt. No. 83, Ex. 7, at 316:4–20.

### C. Chief Rodriguez's Disciplinary Actions

On March 3, 2025, after reviewing Rivera's report, Chief Rodriguez recommended Plaintiff's termination, citing her refusal to cooperate in the investigation by submitting to a polygraph examination and multiple policy violations. Dkt. No. 83, Ex. 8, at 75:2–76:8; Dkt. No. 83, Ex. 9, at A.1–A.2; Dkt. 83, Ex. 10, at C.2.

In a Uniform Notice of Disciplinary Action dated February 27, 2025, Rivera indicated that his "findings on Officer Lopez [were] sustained until [he] receive[d] the results of [Lopez's] polygraph examination." Def.'s UMF ¶ 27; Dkt. No. 83, Ex. 3, at C.2. But on March 12, 2025, Lopez met with Chief Rodriguez and once again reversed his position on taking a polygraph examination. Def.'s UMF ¶ 28. At that time, Lopez advised that he would *not* submit to a polygraph examination, and he resigned from his position as a CPD Officer. Def.'s UMF ¶ 28. In

an undated memorandum, which Chief Rodriguez attested that he wrote but does not say when, Chief Rodriguez explained that "[h]ad Officer Lopez remained employed" by CPD, rather than having resigned, "the appropriate disciplinary action" for his policy violations "would have been discharge." Dkt. No. 83, Ex. 10, at 1 ¶ 4, B.1.

### D. City Administrator Austin's Disciplinary Action

Plaintiff appealed the Chief's termination recommendation to the City Administrator, Wendy Austin. Dkt. No. 83, Ex. 10, at B.1. Plaintiff also attended a pre-determination hearing before Austin on March 13, 2025, at which she confirmed her refusal to take a polygraph examination. Def.'s UMF ¶¶ 32–33; Dkt. No. 83, Ex. 2, at C.1. For the first time, Plaintiff also disclosed that she and Lopez had met in person at a local gym, though she insisted there was no sexual conduct during that encounter. Dkt. No. 83, Ex. 11, at 237:24–239:21. Because Plaintiff did not mention this encounter during the IA investigation, Austin determined that Plaintiff's after-the-fact disclosure was "disingenuous" and, together with her refusal to take a polygraph, suggested that she was not credible as a witness. Def.'s UMF ¶ 35; Dkt. No. 83, Ex. 11, at 237:24–239:21, 248:5–24. Austin ultimately affirmed Chief Rodriguez's recommendation, terminating Plaintiff's employment due to violations of CPD policies related to internal investigations, sexual misconduct, and professional standards of conduct. Dkt. No. 83, Ex. 2, at C.2.

### E. Plaintiff's Proposed Comparator Evidence

Before Jessie Rodriguez became CPD Police Chief in December 2024, and before the rumors began circulating about a sexual relationship between Plaintiff and Lopez, there were various rumors and allegations of sexual misconduct by other CPD employees, including some about now-Chief Rodriguez himself. Beginning in 2015, for instance, there was a rumor that Rodriguez was having an affair with a CPD employee/secretary named Nicole Carrasco. Pl.'s

9

AUMF ¶ N. Indeed, Rodriguez testified that he had received anonymous text messages accusing him of such an affair. Pl.'s AUMF ¶ N. No investigation was initiated into that rumor, however, nor was Rodriguez directed to undergo a polygraph examination. Pl.'s AUMF ¶ N. Also, in 2017, a former CPD officer reported that now-Chief (then-lieutenant) Rodriguez had sex with Selena Schwiger while on duty. Pl.'s AUMF ¶ M. Defendant's investigation into this reported incident consisted of a short conversation in which the investigator asked Rodriguez if the allegation was true, to which Rodriguez responded in the negative. Pl.'s AUMF ¶ M. No polygraph was requested or ordered, and Rodrguez was not disciplined. Pl.'s AUMF ¶ M.

There were allegations of sexual misconduct by other CPD employees that preceded Chief Rodriguez's administration. In 2017, for example, CPD Officer Ryan Rodriguez was found to have had oral sex with a CPD applicant. Pl.'s AUMF ¶ U. During the IA investigation into this alleged sexual misconduct, Ryan Rodriguez was ordered to undergo a polygraph examination, but he instead admitted to the misconduct and was terminated by CPD.[8] Dkt. No. 101, Ex. 4, at 225:3–226:11.

Next, in 2020, during the tenure of former Police Chief Shane Skinner, CPD Officer Steve Munroe was accused by his ex-girlfriend of (i) searching for underage pornography; (ii) secreting a camera in the bedroom of his ex-girlfriend's nineteen-year-old daughter; and (iii) trying to entice a neighborhood 12-year-old girl into a text message conversation. Pl.'s AUMF ¶¶ P–Q; Dkt. No. 93, Ex. B.7, at 1. In light of these serious allegations, Munroe became the subject of an IA investigation, which was performed by Lieutenant Rivera and overseen by then-Captain (now-

---

[8] Plaintiff notes that Ryan Rodriguez received a sanction from the law enforcement academy for his misconduct at CPD, and that five to six years later, then-Chief Skinner recommended his rehire. Pl.'s AUMF ¶ U; Dkt. No. 101, Ex. 4, at 227:12–22; Dkt. No. 101, Ex. 5, at 132:13–133:25. Relatedly, she observes that another CPD employee resigned in the face of sexual misconduct allegations, only to be rehired by CPD at a later date. *See* Pl.'s AUMF ¶ R (rehiring of Chris Caron). Because Plaintiff does not allege that CPD discriminated against her by failing to rehire her, the Court does not consider these facts material to its analysis.

Chief) Rodriguez. Pl.'s AUMF ¶ Q; Dkt. No. 93, Ex. B.7, at 1. The investigation explored evidence concerning the girlfriend's allegations. Pl.'s AUMF ¶ Q (citing Dkt. No. 93, Ex. B.7, at 3011 (ex-girlfriend stating that Munroe searched for "young teen naked girls" in his google account), at 3016 (Munroe admitted to placing a video camera in the room where his ex-girlfriend's daughter sleeps when she is home from college), at 3016 (ex-girlfriend describing Munroe's iPad texting with a 12-year-old girl). According to Rodriguez, however, there were "no hits" for child pornography searches uncovered during the investigation. Dkt. No. 101, Ex. 1, at 296:1–6. Rivera also reported that there was no evidence of underage pornography sent between Munroe and other CPD employees. Dkt. No. 93, Ex. B7, at 3032. Munroe agreed to submit to a voluntary polygraph examination with respect to the child pornography allegations.[9] Pl.'s AUMF ¶ Q. The polygrapher reported that Munroe's examination results were initially inconclusive and that two additional tests were therefore completed with the same series of questions. Dkt. No. 93, Ex. B.7, at 3025. According to the polygrapher, the final two tests showed deception by Munroe, and those results were confirmed by another experienced, certified polygrapher. Dkt. No. 93, Ex. B.7, at 3025, 3027; Dkt. No. 101, Ex. 1, at 291:10–292:8. Because he considered Munroe's polygraph results inconsistent, Rivera did not give them any weight. Dkt. No. 101, Ex. 1, at 291:10–292:8. Rivera ultimately determined that the charges against Munroe were "unfounded," meaning they were "false or not based on valid facts." Pl.'s AUMF ¶ Q; Dkt. No. 93, Ex. B7, at 3032. Munroe continued to work at CPD, at least as of August 2025. Pl.'s AUMF ¶ Q; Dkt. No. 93, Ex. B.1, at 87:4–5.

---

[9] The polygrapher informed Rivera that he would need to complete a separate polygraph examination for each allegation to maintain the integrity and accuracy of the examination, and Rivera indicated that the child pornography allegation was the most critical. Dkt. No. 93, Ex. B.7, at 3024.

Additional allegations of sexual misconduct arose later in Skinner's tenure as Chief. In September 2022, it was reported that CPD Sergeant Chris Caron had sex with an Allsup's gas station attendant while he was on duty. Pl.'s AUMF ¶ R. Caron resigned, though CPD's investigation continued without a statement from him or a polygraph. Pl.'s AUMF ¶ R; Dkt. No. 93, Ex. B.1, at 89:22–24, 253:20–254:22; Dkt. No. 93, Ex. B.8, at 1985, 2781. Also in 2022, Richard Cage, a former CPD lieutenant, was attending a law enforcement conference in Orlando when he allegedly solicited another woman at the conference via an application used by the conference attendees. Pl.'s AUMF ¶ T. Then-Chief Skinner recommended a severe suspension and demotion, but the City Administrator, a predecessor of Wendy Austin, reduced the suspension to only 8 hours. Pl.'s AUMF ¶ T; Dkt. No. 101, Ex. 3, at 30:2–7.

Skinner himself was also the subject of a long-time rumor that he was having an affair with his secretary, including in his CPD office, while he served as Police Chief. Pl.'s AUMF ¶ O. Sandy Countryman, the City's Human Resource Director at the time, discussed initiating an investigation into the affair allegations with City Administrator Austin. Def.'s Reply to Pl.'s AUMF ¶ P, Dkt. No. 101 at 5; Dkt. No. 101, Ex. 3, at 252:7–9. Austin agreed that an investigation was warranted. Def.'s Reply to Pl.'s AUMF ¶ P, Dkt. No. 101 at 5; Dkt. No. 101, Ex. 3, at 252:9–11. When Skinner asked Austin whether he would be required to submit to a polygraph as part of the investigation, Austin advised that he may need to do so. Def.'s Reply to Pl.'s AUMF ¶ P, Dkt. No. 101 at 5; Dkt. No. 101, Ex. 3, at 252:14–22. The investigation into Skinner's alleged affair was quickly discontinued when Skinner decided to retire, advising that he preferred retirement over enduring the investigation. Def.'s Reply to Pl.'s AUMF ¶ P, Dkt. No. 101 at 5; Dkt. No. 101, Ex. 3, at 252:12–14, 254:15–17. According to Austin, the City could not force Skinner's

12

participation in the investigation once he retired. Def.'s Reply to Pl.'s AUMF ¶ P, Dkt. No. 101 at 5; Dkt. No. 101, Ex. 3, at 254:17–18.

After Rodriguez became Police Chief in December 2024, and around the same time that Plaintiff and Lopez were being investigated for alleged sexual misconduct, there were two independent allegations of sexual misconduct by other CPD employees that culminated in formal investigations. First, on or around December 11, 2024, Rory Castaneda, a CPD lieutenant, approached a female community service officer named Kinzie Dominguez and "poked and tickled" her. Pl.'s AUMF ¶ V. When Dominguez asked Castaneda to stop, jokingly and with a smile, he failed to do so. Pl.'s AUMF ¶ V; Dkt. No. 93, Ex. B.9, at 3498–99. Lorraine Montoya, another employee at CPD, reported the incident to her supervisor. Dkt. No. 93, Ex. B.9, at 3495, 3497. The incident was investigated by Artesia Police Department and found "not [to] equate to the level of sexual harassment" but to constitute something closer to "harassment in the workplace." Pl.'s AUMF ¶ V; Dkt. No. 93, Ex. B.9, at 3495, 3501. During his interview, Castaneda suggested that although his actions weren't "normal," they were "normalized" within CPD. Pl.'s AUMF ¶ V; Dkt. No. 93, Ex. B.9, at 3501. Both the investigator and Rodriguez attributed the reporting of the incident to Montoya's "motherly instinct." Pl.'s AUMF ¶ V; Dkt. No. 93, Ex. B.9, at 3484, 3501. Chief Rodriguez recommended that Castaneda, Dominguez, and Montoya attend sexual harassment training to address "the investigator's perception of cultural normalization of unprofessional behavior and reinforce City of Carlsbad expectations." Dkt. No. 93, Ex. B.9, at 3486. Separately, he recommended formal counseling for Castaneda to reinforce the importance of professional conduct. Dkt. No. 93, Ex. B.9, at 3486.

In January 2025, Chief Rodriguez initiated an IA investigation with respect to allegations that Chris Caron, who by that time had been rehired by CPD, left his jurisdiction while on duty to

13

engage in "courting behavior" with a female outside Carlsbad. Pl.'s AUMF ¶ S; Dkt. No. 93, Ex. B.1, at 256:5–11. At the conclusion of the investigation, Chief Rodriguez recommended a 40-hour suspension due to the nature of the allegations and in consideration of Caron's past disciplinary history, and Caron did not appeal Rodriguez's decision to a pre-determination hearing. Pl.'s AUMF ¶ S; Dkt. No. 93, Ex. B.1, at 256:12–14; Dkt. No. 101, Ex. 4, at 257:4–258:4.

Separate and apart from investigations into alleged *sexual* misconduct by CPD employees, Chief Rodriguez also initiated an IA investigation in April 2025 into possible violations of professional standards of conduct by two CPD officers, John Sneathen and Devon Stinson, who ordered trousers and boots through the CPD website to be delivered to their residence. Pl.'s AUMF ¶ W. Although such a transaction was not against CPD policy, Chief Rodriguez suspected that Sneathen and Stinson intended to keep the apparel after leaving CPD, given that they were interviewing for jobs with other departments. Pl.'s AUMF ¶ W. Rather than requesting that Sneathen and Stinson return the apparel, Chief Rodriguez instead ordered an IA investigation, hiring an outside firm to conduct it. Pl.'s AUMF ¶ W.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. at 248.

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and must designate specific facts derived from admissible evidence (affidavits, depositions, answers to interrogatories, or admissions) demonstrating a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In deciding a motion for summary judgment, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995). If there is no genuine issue of material fact in dispute, then the court must determine whether the movant is entitled to judgment in its favor as a matter of law. *See Jenkins v. Wood*, 81 F.3d 998, 990 (10th Cir. 1996); *Celotex Corp.*, 477 U.S. at 322.

## IV. PARTIES' PRIMARY ARGUMENTS

With respect to Plaintiff's Title VII claim, Defendant concedes, for purposes of summary judgment analysis, that Plaintiff can establish a prima facie case of gender discrimination. Dkt. No. 83 at 12. As to the second and third prongs of the inquiry, though, Defendant insists that it has articulated legitimate, non-discriminatory reasons for Plaintiff's termination and that Plaintiff has failed to demonstrate those reasons were pretext for gender discrimination. *Id.* at 12–13. It follows, Defendant argues, that Plaintiff also fails to create a genuine issue of fact as to intentional discrimination for purposes of her Equal Protection claim. *Id.* at 19. Alternatively, Defendant contends that Plaintiff fails to establish municipal liability for any Equal Protection violation

because Chief Rodriguez and City Administrator Austin did not have final policymaking authority over disciplinary decisions affecting City personnel. *Id*. at 20–21.

For her part, Plaintiff maintains that there is more than enough evidence by which a reasonable jury could infer that Defendant's investigation was pretext for unlawful gender discrimination. Dkt. No. 93 at 4. First, she contends that Prell's informal investigation, which triggered the formal IA investigation, was initiated for pretextual reasons. *Id*. at 15. Next, she argues that the IA investigation and the directive to undergo a polygraph examination were themselves pretextual. *Id*. at 17–27. Finally, she alleges that she was treated differently than similarly situated men at CPD, highlighting what she describes as disparate treatment of seven individuals who she insists were similarly situated and accused of engaging in misconduct of comparable seriousness. *Id*. at 28–32. As for Officer Lopez, Plaintiff contends that he is an insufficient comparator for purposes of her discrimination claims. *Id*. at 32–33. With respect to her Equal Protection claim, Plaintiff insists that Chief Rodriguez and City Administrator *are* final policymakers for purposes of municipal liability. *Id*. at 34–35. In this regard, she emphasizes that the City had delegated to City Administrator Austin the authority to affirm Chief Rodriguez's termination recommendation. *Id*. at 34.

In reply, Defendant maintains that Plaintiff is *not* similarly situated to any of the male CPD employees she identified in her response. Dkt. No. 101 at 10–11. Defendant notes that much of the alleged misconduct by the identified individuals took place before Rodriguez was the Police Chief and Austin the City Administrator. *Id*. at 11. As to other alleged misconduct, Defendant argues that it was "not comparably similar" to the misconduct of which Plaintiff and Lopez were accused. *Id*. at 12. In Defendant's view, Lopez is the only appropriate comparator to Plaintiff, as he is the only individual similarly situated and accused of the same misconduct. *Id*. at 13. Defendant

16

contends that Chief Rodriguez would have recommended the same disciplinary action (*i.e.*, termination) against Lopez for the same reason (*i.e.*, refusing a polygraph examination and not cooperating with an IA investigation), had Lopez not resigned. *Id*. Finally, as to Plaintiff's Equal Protection claim, Defendant asserts that City Administrator Austin was meaningfully constrained by New Mexico statute in that her decision whether to affirm Chief Rodriguez's recommendation was subject to review by the City Council. *Id*. at 15. Because there is no statute or ordinance granting a City Administrator final decision-making authority over termination decisions, because the City Council did not delegate that authority to Austin, and because Plaintiff did not seek review of her termination by the City Council, Defendant maintains that no municipal liability lies for Plaintiff's termination. *Id*.

## V.  ANALYSIS

Plaintiff contends that Defendant terminated her employment with CPD because of her gender in violation of Title VII and the Fourteenth Amendment's Equal Protection Clause.[10] Dkt.

---

[10] Plaintiff asserts in her Complaint that Defendant discriminated against her "by, among other things, harassing her, subjecting her to a hostile work environment, and terminating her." Dkt. No. 1-1 ¶¶ 59, 69. When Defendant sought summary judgment on Plaintiff's Title VII claim, Plaintiff came forward with evidence in support of a disparate treatment theory of discrimination. "Disparate treatment and hostile work environment claims are separate and distinct causes of action designed to redress different forms of discrimination in the work place each having different elements of proof." *Montano v. Donahoe*, No. CV 14-0634 WJ/GJF, 2017 WL 3412102, *14 (D.N.M. Mar. 22, 2017) (citing *Nat'l R.R. Passenger v. Morgan*, 536 U.S. 101, 103 (2002)). For a hostile environment claim to survive a summary judgment motion, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998). Not only has Plaintiff failed to come forward with evidence supporting a hostile work environment claim, but she also gives no indication that she intends to preserve a sub-claim under this distinct theory of liability under Title VII.

No. 1-1 ¶¶ 59, 69, 85. The Court first analyzes Plaintiff's Title VII claim, then turns to her Equal Protection claim and, finally, to the issue of supplemental jurisdiction.

### A.  Framework for Title VII discrimination claims

To survive summary judgment on a gender discrimination claim, a plaintiff must present "either direct evidence or circumstantial evidence that creates an inference of intentional discrimination." *Bennett v. Windstream Comms., Inc*., 792 F.3d 1261, 1266 (10th Cir. 2015) (citation omitted). Where, as here, a plaintiff relies on circumstantial evidence to show her employer's intent, her discrimination claims must be analyzed in accordance with the three-step inquiry derived from *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973). The parties agree that the Court must employ that framework in evaluating Plaintiff's Title VII claim here. *See* Dkt. No. 83 at 10; Dkt. No. 93 at 14.

Under the *McDonnell Douglas* framework, the plaintiff first bears the burden "to show by a preponderance of the evidence that she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination." *Bennett*, 792 F.3d at 1266. This initial prima facie burden is not onerous, and its elements "are neither rigid nor mechanistic." *Id.* If the plaintiff makes this prima facie showing, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its" adverse employment action. *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 979 (10th Cir. 2008). If the defendant does so, "the burden shifts back again to the plaintiff to show that the defendant's proffered reasons were a pretext for discrimination." *Id.* "Mere conjecture that

18

the employer's explanation is pretext is insufficient to defeat summary judgment." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999).

Defendant concedes, but only for purposes of summary judgment analysis, that Plaintiff can establish a prima facie case of gender discrimination under Title VII (*see* Dkt. No. 83 at 12). In light of this concession, and given the Court's resolution of the second and third steps of the *McDonnell Douglas* framework below, the Court streamlines its analysis by assuming that Plaintiff has established a prima facie case of gender discrimination.

### B. Defendant articulates legitimate, non-discriminatory reasons for Plaintiff's termination.

At the second step of the *McDonnell Douglas* framework, Defendant need only "explain its actions against [P]laintiff in terms that are not facially prohibited" by federal and state discrimination laws. *EEOC v. Flasher*, 986 F.2d 1312, 1317 (10th Cir. 1992) (citation omitted). As the Tenth Circuit has explained, "[t]his burden is exceedingly light; the defendant must merely proffer non-gender based reasons, not prove them." *Sprague v. Thorn Am., Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997) (citations omitted).

Defendant insists that Police Chief Jessie Rodriguez offered legitimate, non-discriminatory reasons for recommending Plaintiff's termination: (1) because Plaintiff "did not cooperate with the internal affairs investigation by refusing to take a mandatory polygraph examination" and (2) because of "the severity of her policy violations." Dkt. No. 83 at 13 (citing Def.'s UMF ¶ 32). Likewise, Defendant emphasizes that City Administrator Wendy Austin offered legitimate, non-discriminatory reasons for upholding Chief Rodriguez's termination recommendation: (1) because "Plaintiff refused to take a polygraph examination" and (2) because Plaintiff "appeared to be dishonest during the internal affairs investigation and pre-determination hearing." Dkt. No. 83 at 13 (citing Def.'s UMF ¶¶ 35–38).

Underlying the disciplinary actions of Chief Rodriguez and City Administrator Austin were Lieutenant Rivera's IA investigation and report, which outlined his findings that Plaintiff had been deceitful and had violated CPD policies governing cooperation with investigations, sexual misconduct, and professional standards of conduct. The CPD internal investigations policy, on which Rivera relied, requires CPD employees to cooperate with investigations, including submitting to a polygraph, and it provides that failing to cooperate subjects a CPD employee to disciplinary action. Both Chief Rodriguez and City Administrator Austin relied on the findings in Rivera's report in reaching their decisions. In addition, Plaintiff confirmed her refusal to take a polygraph examination at the pre-determination hearing with Austin, and she disclosed for the first time an off-duty encounter with Lopez, though she insisted it was not sexual in nature. Because Plaintiff had not mentioned the prior encounter with Lopez during the IA investigation, Austin determined that her after-the-fact disclosure was "disingenuous" and, together with her refusal to take a polygraph examination, suggested that she was not credible as a witness.

The Court is satisfied, and Plaintiff concedes (*see* Hr'g at 12:33:22–12:33:29), that the City has adequately articulated its reasons for terminating Plaintiff's employment in terms that are not facially prohibited by federal discrimination law but are instead grounded in CPD policy. As such, Defendant has met its "exceedingly light" second-step burden with respect to Plaintiff's termination, and the burden shifts back to Plaintiff to show that the reasons offered for her termination were pretext for gender discrimination.

### C. Plaintiff has not presented sufficient evidence for a reasonable jury to conclude that the explanations Defendant offered for Plaintiff's termination were pretext for gender discrimination.

At the final step of the *McDonnell Douglas* inquiry, the plaintiff must produce evidence that the explanations offered by the defendant for its actions were merely pretextual. *Bennett*, 792

F.3d at 1268. The presumption of discrimination resulting from the plaintiff's prima facie showing "drops out of the picture, and [t]he plaintiff then carries the full burden of persuasion to show that the defendant discriminated on the illegal basis of . . . gender." *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160 (10th Cir. 2007) (citations omitted). A "plaintiff may establish pretext by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Bennett*, 792 F.3d at 1267 (quoting *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010)). The Supreme Court has identified factors relevant to a court's inquiry: "the strength of the plaintiff's prima facie case; the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148–49 (2000). Although the Court must construe all facts in the light most favorable to Plaintiff as the non-movant, it must not second-guess Defendant's business judgment or replace Defendant's opinions of best practices with its own or those of Plaintiff. *Bennett*, 792 F.3d at 1268 (citing *Garrison v. Gambro, Inc.*, 428 F.3d 933, 938 (10th Cir. 2005)).

There is more than one method for demonstrating pretext. A plaintiff may, for example, present direct evidence that the defendant's articulated reasons for its actions were false or unworthy of credence. *See Swackhammer*, 493 F.3d at 1167, 1170. Another method is for the plaintiff to show that the defendant treated her differently from "other similarly-situated employees who violated work rules of comparable seriousness." *Id*. at 1167–68. Plaintiff has employed both methods, so the Court considers each in turn.

      i.    **Evidence that Defendant's Articulated Reasons for Plaintiff's Termination Are False or Unworthy of Credence**

Plaintiff insists that her policy violations and alleged sexual misconduct on CPD premises were not the *true* reasons for her termination. She does *not* contend, however, that she *complied* with the CPD policy requiring her cooperation with the IA investigation and her submission to a mandatory polygraph examination. Nor could she. After all, the undisputed facts show that Plaintiff *twice* refused to submit to a mandatory polygraph – once during the investigative stage and again during the pre-determination hearing. Nor does Plaintiff suggest that she had a right to refuse to participate in a polygraph as part of an IA investigation. *See* Hr'g at 12:31:20–12:31:36. Plaintiff instead contends that Defendant's articulated reasons for her termination are unworthy of credence because: (1) Prell's informal investigation was initiated for pretextual reasons; (2) the IA investigation itself was pretextual; (3) Chief Rodriguez routinely uses IA investigations to avenge personal grievances; (4) the directive to submit to a polygraph was pretextual; and (5) Defendant administers polygraphs in a discriminatory fashion. Dkt. No. 93 at 15–28. In other words, Plaintiff submits that the IA investigation was not initiated or conducted in good faith. Notably, an investigation that is flawed, inadequate, or conducted in a manner distinct from investigations into similar conduct by similarly-situated employees may create a genuine dispute of material fact on the issue of pretext. *See Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1193 (10th Cir. 2021).

### a. *Prell's Informal Investigation*

It is undisputed that the IA investigation into Plaintiff's alleged sexual misconduct was launched on the heels of an informal investigation, in January 2025, by Dispatch Commander Katey Prell and at Prell's recommendation. Plaintiff insists that this underlying initial investigation was initiated for pretextual reasons. Dkt. No. 93 at 15. In support, she points to evidence that rumors of her sexual encounters with Lopez had already been circulating at CPD for four to five

months — since around August or September 2024 — when Prell initiated the informal investigation. *Id*. (citing Dkt. No. 93, Ex. B.12 at 26:12–16 (Parker's Deposition)). Although Defendant contends that Prell initiated her investigation due to "Plaintiff's behavior and demeanor as a supervisor," and Prell herself explains that she initiated the investigation because she was approached about rumors of Plaintiff's inappropriate conduct with CPD officers, Plaintiff insists that the impetus was her "critical comments about Prell at the December 2024 union meeting." *Id*. (citing Dkt. No. 83 at 3, UMF ¶¶ 5, 6; Dkt. No. 83, Ex. 3, at B.1). That is, Plaintiff infers that Prell's initial investigation was initiated for *retaliatory* reasons and not for those articulated by Defendant and Prell herself.

Plaintiff fleshes this argument out more thoroughly in her response to Defendant's Motion for Summary Judgment on Whistleblower Protection Act Claims (Dkt. No. 92), which she incorporates by reference into her response to the instant Motion. *See* Dkt. No. 93 at 15 n.8. There, she contends that timing alone provides a reasonable basis upon which a jury could conclude that Defendant's investigation, and ultimately her termination, were retaliatory.  Dkt. No. 92 at 12–13. She observes that the memorandum in which Prell recommended the commencement of an IA investigation into Plaintiff's alleged misconduct was prepared *only three weeks* after Plaintiff made statements critical of Prell at the union meeting. *Id*. at 12. Apart from the timing of the investigation, Plaintiff points to the following additional facts that she contends support an inference that Prell was motivated to punish her for critical comments: (1) Prell's memorandum indicated that Prell believed Plaintiff was badmouthing supervisors at union meetings (Dkt. No. 92 at 12 (citing Dkt. No. 92, Ex. 7, at B.3)); and (2) Prell's memorandum only recommended that Plaintiff be subjected to an IA investigation, making no such recommendation as to Lopez (Dkt. No. 92 at 12 (citing Dkt. No. 92, Ex. 7, at B.1)).

At oral argument, Plaintiff's counsel clarified that the evidence before the Court does not suggest that Prell was motivated by *gender* discrimination. *See* Hr'g at 12:34:32–12:34:43. Instead, Plaintiff maintains that Prell pursued an investigation against Plaintiff in retaliation for the negative comments Plaintiff made about her at the December 2024 union meeting. *See id*. Thus, even under Plaintiff's theory, Prell's initial investigation was motivated by a *non-discriminatory* motive having nothing to do with Plaintiff's gender. According to Defendant, even if there is evidence that Prell and Rodriguez were motivated by grudges against Plaintiff because of her negative comments, that motivation would not be prohibited by Title VII. Dkt. No. 101 at 10 (citing *Benzies v. Ill. Dep't of Mental Health and Developmental Disabilities*, 810 F.2d 146 (7th Cir. 1987)).

Plaintiff takes a different view of the law. Relying on *Reeves*, she submits that to survive summary judgment she need only present evidence that Defendant's articulated reasons for initiating the investigation were generally pretextual, not that they were pretextual *for gender discrimination*. *See* Hr'g at 12:33:43–12:34:09, 12:39:02–12:40:57. But a close reading of *Reeves* and Tenth Circuit law applying *Reeves* suggests that Plaintiff's burden to show pretext is not as light as she contemplates.

To the extent Plaintiff relies upon *Reeves* for the proposition that proof of the falsity of a defendant's articulated reason for an employment action can be a form of circumstantial evidence probative of intentional discrimination, the Court agrees. *See Reeves*, 530 U.S. at 147 (observing that under some circumstances evidence of the falsity of the defendant's articulated reason can be "quite persuasive"). In *Reeves*, the Court reasoned that "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id*. But critically, the Court did not say that such evidence *always* suffices to defeat summary judgment. Indeed, it acknowledged that "there will be instances

where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id*. at 148. The Court went on to explain that "an employer [is] entitled to judgment as a matter of law if the record conclusively reveal[s] some other nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reasons [were] untrue and there is abundant and uncontroverted independent evidence that no discrimination has occurred." *Id*. at 148. As the Tenth Circuit put it in *Swackhammer*, "the falsity of an employer's proffered explanation . . . defeats summary judgment *only if* it could reasonably lead the trier of fact to infer a *discriminatory* motive; where the evidence of pretext supports only *nondiscriminatory* motives, such an inference is logically precluded and summary judgment for the employer is appropriate." 493 F.3d at 1168 (emphasis added) (citation omitted).

Simply put, Plaintiff cannot satisfy her stage-three burden under *McDonnell Douglas* to demonstrate pretext for *gender discrimination* by showing that Prell's reasons for initiating the initial investigation were pretext for *whistleblower retaliation*. Even apart from potential issues associated with imputing Prell's allegedly pretextual motive to those responsible for the adverse employment action, evidence giving rise to an inference of retaliatory – but not discriminatory – motives, without more, is insufficient to withstand summary judgment on Plaintiff's Title VII gender discrimination claim.

### b. *Rivera's Internal Affairs Investigation*

Next, Plaintiff makes a related argument with a different nuance. She emphasizes that none of the CPD employees Prell interviewed during her informal investigation claimed to have heard an admission directly from Lopez that he had sex with Plaintiff on CPD premises. Dkt. No. 93 at

16. According to Plaintiff, Prell's investigation turned up only "speculative gossip" but nevertheless served as the "trigger" for the formal IA investigation and ultimately Plaintiff's termination. *Id*. It follows, Plaintiff suggests, that Prell's speculative, retaliatory, and informal investigation only resulted in a formal IA investigation *because Plaintiff is a woman. Id*. In support, Plaintiff contends that when male CPD employees, like former Chief Skinner and Chief Rodriguez, became the subject of sexual misconduct rumors, no investigations ensued. *Id*. While Skinner resigned in the face of a forthcoming investigation,[11] the Court agrees that there is record evidence that sexual misconduct rumors involving Chief Rodriguez did *not* prompt an IA investigation. But, as discussed below, no inference of gender discrimination flows merely from the absence of a formal investigation into a Police Chief's rumored sexual misconduct. *See supra* Part V.C.ii.b. Moreover, the record reflects that Defendant *did* initiate investigations concerning sexual misconduct by male CPD employees accused of sexual misconduct, including Chris Caron, Ryan Rodriguez, Steve Munroe, and Omar Lopez.

In addition to arguing that the investigation was *initiated* for pretextual reasons, Plaintiff asserts that the investigation was *conducted* in a pretextual manner. Dkt. No. 93 at 17. Observing that Rivera indicated in his report that his objective was to *prove* the rumors about Plaintiff and Lopez were false, Plaintiff contends that it would be "preposterous" for Rivera to think he could prove whether Plaintiff and Lopez did or did not have sex in the CPD bathroom or whether Lopez did or did not make a truthful confession about having done so. *Id*. But even if Rivera was unlikely to uncover *definitive proof* whether sex occurred in the CPD bathroom or Lopez truthfully confessed, the Court does not agree that this supports an inference that the investigation was

---

[11] Although the Human Resources Director initiated an initial investigation into Skinner's alleged affair, that investigation ended when Skinner decided to retire, advising that he preferred retirement over going through an investigation. Def.'s Reply to Pl.'s AUMF ¶ P; Dkt. No. 101, Ex. 3, at 252:12–14, 254:15–17.

therefore pretextual for gender discrimination. Nor does it suggest that Defendant acted in bad faith by conducting an investigation at all. *See Bennett*, 792 F.3d at 1268 (reasoning that a court must only ask "whether the employer honestly believed its reasons and acted in good faith upon them") (citation omitted).

Next, Plaintiff criticizes the depth to which Rivera explored the details of Lopez's alleged confessions with the witnesses he interviewed. Dkt. No. 93 at 17. She contends that Rivera failed to sufficiently probe the witnesses about the nature of Lopez's confessions because "he knew what result the Chief wanted, and he knew his job was to find enough to support that conclusion." *Id*. at 19. In support, she argues that Ciera Samaniego provided a detailed description of where Lopez confessed (*i.e.*, in her kitchen) and who was present when he did so (*i.e.*, Mario Rocha, Juan Murillo, Amairani Valles, and Frankie Martinez), and yet Rivera "never asked these witnesses about this supposed confession." *Id*. at 17. To the contrary, though, Rivera *did* interview three of the four individuals Samaniego identified, eliciting information from each as to what they heard directly from Lopez concerning his intimate associations with Plaintiff.[12]

Plaintiff also identifies inconsistencies in the statements that witnesses gave Rivera during the IA interview. For instance, she notes that despite other CPD employees reporting that they were present at a November 2024 party when Lopez was asked about his rumored relationship with Plaintiff, only Samaniego reported that Lopez admitted to having sex with Plaintiff in the CPD bathroom, and she later contradicted that claim by stating that Lopez "didn't really answer

---

[12] Mario Rocha reported to Rivera that he learned about the rumors concerning Plaintiff and Lopez from third parties and that when he asked Lopez about them directly, Lopez denied them. Dkt. No. 83, Ex. 3, at A.15. Murillo admitted being present when Lopez confessed to having sexual relations with Plaintiff but indicated that Lopez did not specify where the sexual encounters occurred. Valles indicated that Lopez admitted to having sex with Plaintiff in the CPD bathroom but claimed that admission took place in the CPD dispatch room (with Cassi Parker, Juan Murillo, and herself present), not in Samaniego's kitchen. Valles also reported being at an off-duty get together when "guys" from work asked Lopez for details about the rumors concerning him and Plaintiff, but Lopez did not respond.

the question" about what occurred in the bathroom. Moreover, Valles told Rivera that, while she was in the CPD dispatch room with Lopez, Parker, and Murillo, Lopez admitted to having sex with Plaintiff in the CPD bathroom. But Plaintiff notes that both Parker and Murillo reported that Lopez did not provide details about where any sexual encounter with Plaintiff occurred. Plaintiff intimates that these inconsistencies should have cast doubt on the witnesses' reports about Lopez's confessions. Dkt. No. 93 at 18. But significantly, Rivera himself acknowledged that there were inconsistencies in the witness statements, which served as the basis for his recommendation that Plaintiff and Lopez undergo polygraph examinations.

Plaintiff's criticisms of Rivera's investigation continue in several more ways. First, she argues that Rivera neglected to consider the witnesses' motives and grudges against Plaintiff (*e.g.*, Lopez's previous rejection of Valles's "drunken romantic advances" or Valles's attempts to make sure Plaintiff was terminated). *Id*. at 18–19. But Rivera's report demonstrates that he *did* explore the issue of motive during his investigation. He noted that Plaintiff, in her final interview, attributed the allegations against her and Lopez to Lopez's rejection of Valles's sexual advances. And when Lopez mentioned in his final interview that he felt as though he was "being drug under the bus because Amairani [Valles] got rejected by him at a party and because she has an issue with Styring," Rivera acknowledged these alleged personal vendettas and asked why they weren't mentioned in earlier interviews, noting that evidence of motive was critical to the investigation. That Rivera was not *persuaded* by these belated revelations does not mean that he failed to consider them. Nor does it render the investigation or his findings unworthy of credence.

Second, Plaintiff contends that Rivera ignored the nature of Lopez's supposed confessions. *Id*. at 19.  That is, Plaintiff contends that Lopez, rather than offering sincere confessions, merely "relent[ed]" after constant badgering about rumors involving Plaintiff. *Id*. Even if there is evidence

28

of some element of "badgering" that preceded Lopez's confessions, it does not follow that a reasonable factfinder could infer therefrom pretext for gender discrimination, particularly where both subjects of the investigation – one female and one male – refused to submit to polygraph examinations aimed at determining the veracity of Lopez's supposed confessions and their subject matter.

Third, Plaintiff contends that Rivera "lie[d]" to Defendant's polygrapher and thereby revealed that he "had it out for Plaintiff," which she says constitutes "evidence of the pretextual nature of the investigation." *Id*. at 20–21. Instead of Rivera feeding the polygrapher "lies," the record shows that Rivera included a minor mischaracterization of one witness's statement in the background information he provided to a polygrapher who was retained but never administered a polygraph. That is, Rivera told the polygrapher that both Parker and Valles heard Lopez admit to having sex with Plaintiff *at CPD*, whereas his report indicates that Parker did not receive details from Lopez about *where* his sexual encounters with Plaintiff occurred. This evidence does not undermine the legitimacy of the investigation, nor does it create a genuine issue of material fact as to pretext for gender discrimination.

Fourth, Plaintiff contends that Chief Rodriguez has routinely used IA investigations to avenge personal grievances. *Id*. at 21. In support, she points to an IA investigation that Chief Rodriguez initiated in April 2025, arguing that its purpose was to punish two CPD officers for leaving for another department. *Id*. Plaintiff also observes that, in his deposition testimony, former Chief Skinner described a perception at CPD that Chief Rodriguez treats those with whom he is friendly more favorably. *Id*. at 22. Having reviewed the evidence Plaintiff cites, the Court finds her arguments speculative and her evidence immaterial to the gender discrimination claims at issue. *Cf. Swackhammer*, 493 F.3d at 1171 (reasoning that evidence that a supervisor treated

another individual more favorably than the plaintiff due to his close friendship with that individual failed to permit a reasonable factfinder to reach an inference of illegal gender discrimination).

Fifth, over the course of five and a half pages, Plaintiff meticulously constructs a multi-part argument in support of her position that the directive to undergo a polygraph was pretextual for gender discrimination. *See id*. at 22–28. First, she submits that, according to the testimony of Defendant's own polygraph expert, Defendant should not have forced Plaintiff to submit to a polygraph. *Id*. at 22–26. Plaintiff reasons that because she "knew she was innocent" and was therefore in a "low base rate scenario," it was rational for her not to take a polygraph because her accusers were assuming "a high base rate." *Id*. at 24–25. As the Court understands it, the upshot of Plaintiff's argument is that there was a high probability Plaintiff could fail the polygraph with a false positive. It follows, Plaintiff suggests, that because her "stated reason for refusing the polygraph was perfectly rational[,] . . . Defendant's stated reason for terminating [her]—her refusal to take the polygraph—is akin to punishing the would-be witch for refusing the swimming test." *Id*. at 26. On this point, the Court agrees with *Defendant's* assessment: whether Plaintiff rationally declined a mandatory polygraph is not a material issue that would preclude summary judgment. *See* Dkt. No. 101 at 14. As a CPD employee, Plaintiff knew – indeed, Rivera reminded her – that she risked disciplinary action if she failed to follow CPD policies, including by refusing a mandated polygraph, regardless whether her refusal to do so was rational. And most importantly, even if *mandating* a polygraph was ill-advised for the reasons Plaintiff sets out, no inference of gender discrimination arises where the undisputed evidence reveals that *both* Plaintiff and Lopez received *the same mandate*. *See Swackhammer*, 493 F.3d at 1170 (noting that evidence that an employer uses poor business judgment is not sufficient to show that its explanation for an employment action is unworthy of credence).

30

Finally and relatedly, Plaintiff contends that Defendant has administered polygraphs in a discriminatory manner. Dkt. No. 93 at 26. She argues that male subjects of investigations have been offered "voluntary" polygraphs, whereas she was *required* to take a polygraph as part of her IA investigation. *Id*. at 20. Yet, the undisputed facts before the Court reflect that at least two male CPD employees, Ryan Rodriguez and Omar Lopez, were directed to submit to mandatory polygraph examinations during their IA investigations. The evidence Plaintiff supplies fails to support an inference that Defendant administered polygraph examinations in a gender-biased manner or that Chief Rodriguez's directive that she – *and Lopez* – undergo a polygraph was pretextual for gender discrimination.

In sum, even viewing collectively and in her favor the evidence Plaintiff offers in connection with each of her many critiques of the IA investigation, no reasonable jury could conclude that the IA investigation itself, or Defendant's reliance on its findings, is unworthy of credence. Indeed, there is virtually no probative value to any of the evidence Plaintiff sets forth in this regard. *See Reeves*, 530 U.S. at 149 (explaining that the "probative value of the proof that the employer's explanation is false" is one factor in determining whether summary judgment is appropriate). Certainly, none of Plaintiff's criticism of the IA investigation constitutes the sort of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that might lead a reasonable factfinder to conclude that Defendant's articulated reasons for Plaintiff's termination were pretextual for gender discrimination. *See Bennett*, 792 F.3d at 1267 (quoting *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010)). Nor has Plaintiff shown that Defendant lacked a good faith basis for relying upon the findings of the IA investigation, including the finding that Plaintiff violated CPD policies by failing to cooperate with the investigation by submitting to a mandatory polygraph. *See Vega v. Spring PCS,* No. 03-2589-KHV, 2004 WL 2414100, at *13

(D. Kan. Oct. 25, 2004) (reasoning that the plaintiff had not presented evidence that her employer lacked a good faith belief, based upon the findings of an investigation, that she had committed the acts in question); *see also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (finding no evidence that the investigation that led to the plaintiff's termination was "a sham" or that discriminatory motives influenced the disciplinary decision-makers).

### ii.   Evidence of Disparate Treatment of Proposed Comparators

To sustain a claim of disparate treatment, Plaintiff must show that she was treated differently from other similarly situated employees who were alleged to have violated policies of "comparable seriousness." *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (citing *Elmore v. Capstan, Inc.*, 58 F.3d 525, 529–30 (10th Cir. 1995)). To be characterized as similarly situated, Plaintiff and the comparators she identifies need not have the same job title. *See Ibrahim*, 994 F.3d at 1198. Rather, "[s]imilarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Aramburu*, 112 F.3d at 1404 (citing *Wilson v. Utica Park Clinic, Inc.*, No. 95-5060, 76 F.3d 394, 1996 WL 50462 (10th Cir. Feb. 7, 1996)). Further, in determining whether a given comparator is similarly situated, the Court must compare the "relevant employment circumstances, such as work history and company policies." *Id.* (citing *David v. City and Cnty. of Denver*, 101 F.3d 1344, 1359–60 (10th Cir. 1996)). "Determining the similarity of the situations is generally a fact question." *Ibrahim,* 994 F.3d at 1197 (citing *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007)). Plaintiff cannot "pick and choose" comparators and "completely ignore a significant group of comparators who were treated equally or less favorably than [she]." *English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1012 (10th Cir. 2001).

Here, Plaintiff insists that a reasonable jury could conclude that each of the seven comparators she identifies is similarly situated for purposes of her discrimination claims. Dkt. No. 93 at 28. That is, she contends that each comparator is a CPD employee subject to the same policies, procedures, and ultimate decisionmakers (*i.e.*, the Police Chief and the City Administrator) and that each was alleged to have engaged in similar misconduct. Dkt. No. 93 at 28–29. Plaintiff further asserts that the comparators received more favorable treatment.[13] *Id*. Defendant, on the other hand, insists that *none* of the comparators Plaintiff identifies are similarly situated or raise an inference of gender discrimination.

### a.   *Comparator Evidence Preceding Rodriguez's Administration*

Acknowledging that similarly situated employees are those who deal with the same supervisor, both parties regard the CPD Police Chief and City Administrator as the relevant "supervisors" or "ultimate decisionmakers" for purposes of disparate treatment comparator analysis. *See* Dkt. No. 93 at 28–29; Dkt. No. 101 at 11. Given that Chief Rodriguez recommended Plaintiff's termination, and City Administrator Austin affirmed that decision, the Court agrees.

For its part, Defendant emphasizes that a majority of Plaintiff's proposed comparators were subject to IA investigations or disciplinary actions under a *different* Police Chief and *different* City Administrator. Dkt. No. 101 at 11 (citing *Kendrick,* 220 F.3d at 1233–34). Indeed, Steve Munroe, Chris Caron, Ryan Rodriguez, Richard Cage, and now-Chief Jessie Rodriguez fall into this category. Because the Tenth Circuit defines similarly situated employees as "those who deal with the same supervisor and are subject to the same standards governing performance evaluation and

---

[13] Plaintiff alleges that she was treated differently, indeed less favorably, than the comparators in various respects apart from termination, including (1) being directed to undergo a mandatory polygraph during the IA investigation against her; and (2) being investigated "ad nauseum" with a 40-page written report following multiple rounds of witness interviews. But for purposes of Plaintiff's discrimination claims, the Court's concern is whether Plaintiff was treated differently with respect to the adverse employment action Defendant took against her.

discipline," *Aramburu*, 112 F.3d at 1404, Defendant insists that Plaintiff's comparator evidence as to these five individuals fails to create a genuine issue of fact as to whether her termination was pretext for gender discrimination. Dkt. No. 101 at 11.

To the extent different individuals were serving as Police Chief and City Administrator when disciplinary decisions were rendered, the Court concludes that, at minimum, this fact greatly *diminishes* the evidentiary value of Plaintiff's comparator evidence.[14] *See Kendrick*, 220 F.3d at 1233–34 (observing that different supervisors react differently to given misconduct and concluding that the plaintiff failed to put forth sufficient evidence to create a genuine issue of material fact on the issue of pretext, where the plaintiff and his proposed comparator had different supervisors). Moreover, comparator conduct that occurred years before the plaintiff's alleged conduct is of limited evidentiary value. After all, "[e]mployers' disciplinary practices necessarily change over time, and it would be inappropriate for courts to penalize employers who have modified their practices over a substantial period of time in an effort to better address their business needs." *Id.* at 1234. The Court bears those principles in mind as it considers whether the evidence Plaintiff proffers raises an inference of pretext for gender discrimination.

---

[14] The Court is reluctant to altogether disregard comparator evidence on the ground that different Police Chiefs and City Administrators made the relevant disciplinary decisions, particularly where Chief Rodriguez testified that neither the policies governing sexual misconduct nor the IA investigations changed under his administration. The Court is also cognizant that the Supreme Court, in *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379 (2008), in the context of the Age Discrimination in Employment Act, declined to embrace a categorical rule regarding whether comparator evidence must come from comparators with the same supervisor. There, the Court explained that "[t]he question whether evidence of discrimination by other supervisors is relevant in an individual [discrimination] case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Id.* at 388. Further, on remand from the Supreme Court, the Tenth Circuit reasoned that, for evidence of discrimination by other supervisors to be relevant, "a plaintiff must establish a nexus between the other-employee testimony and the adverse employment action taken against her: she must show that the other-employee testimony 'can logically or reasonably be tied to the adverse employment action' that she suffered." *Mendelsohn v. Sprint/United Mgmt. Co.,* 402 F. App'x 337, 340 (10th Cir. 2010) (citing *Minshall v. McGraw Hill Broad. Co*., 323 F.3d 1273, 1285 (10th Cir. 2003)). Here, the Court is not convinced that Plaintiff has made that showing with respect to the comparators who were subject to different decisionmakers, in large part because she fails to come forward with any evidence that any comparator, regardless of supervisor, was ordered to take a polygraph, refused, and was then treated more favorably. Still, the Court does not disregard comparators who did not share the same Police Chief and City Administrator, though that fact certainly diminishes the comparators' evidentiary value.

First, the Court considers a 2017 allegation that now-Chief (then-Lieutenant) Rodriguez had sex with a woman while on duty. This allegation against Rodriguez resulted in an investigation that consisted of a short conversation in which the investigator asked Rodriguez if the allegation was true, to which Rodriguez responded in the negative. No polygraph was requested or ordered, and Rodriguez was not disciplined. Although the alleged sexual misconduct is of a similar nature to that alleged here, it nevertheless fails to raise an inference of pretext for gender discrimination, both because it occurred seven years before the alleged misconduct here *and* because it occurred under different disciplinary decisionmakers.

The same is true for a separate CPD officer with the same surname. Ryan Rodriguez was alleged to have engaged in oral sex with a CPD applicant, also in 2017. During CPD's IA investigation, which was initiated under different disciplinary decisionmakers than those at issue here, Ryan Rodriguez was ordered to undergo a polygraph examination, but he instead admitted to the allegations and was terminated by CPD. Because the comparator evidence is stale, occurred under different disciplinary decisionmakers, and resulted in the very same adverse employment action as here, no inference of pretext arises.

A bit more recently, but still before Chief Rodriguez's tenure, CPD Officer Steve Munroe became the subject of a 2020 IA investigation performed by Lieutenant Rivera and overseen by then-Captain (now-Chief) Rodriguez when Munroe's girlfriend alleged, among other things, that Monroe had searched for child pornography. Munroe underwent a voluntary polygraph. The polygrapher initially reported inconclusive results but later determined that two tests indicated deception. Nevertheless, because Rivera considered the polygraph findings inconsistent, he did not give them weight and determined that the charges against Munroe were "unfounded." Munroe was not terminated. Even viewing this evidence in the light most favorable to Plaintiff, no

reasonable jury would consider Munroe to be similarly situated to Plaintiff such that his more favorable treatment raises an inference of pretext for gender discrimination. Although aspects of Munroe's alleged behavior were certainly more serious, indeed potentially criminal, Munroe *submitted* to a polygraph examination, whereas Plaintiff refused, and, in contrast to Plaintiff's investigation, Rivera determined that the charges against Munroe were "unfounded." These significant distinctions, together with the fact that Rodriguez was not yet serving as Police Chief or Austin as City Administrator, lead the Court to conclude that this comparator evidence, too, fails to support an inference of pretext for gender discrimination.

Plaintiff points to two comparator incidents from 2022, two years before the allegations here but still before Rodriguez was Chief or Austin was City Administrator. First, CPD Sergeant Chris Caron was reported to have engaged in on-duty sexual relations with a gas station attendant and thereafter resigned. Because Caron resigned, the Court is unable to gauge whether Defendant might have also terminated Caron or imposed less severe disciplinary action than it did against Plaintiff. As such, this comparator evidence does not create a genuine issue of material fact for purposes of Plaintiff's disparate treatment claim.

Also in 2022, former lieutenant Richard Cage, while in Orlando for a law enforcement conference, was alleged to have solicited another conference attendee via an electronic application. Although the then-Police Chief recommended severe suspension and demotion, the City Administrator, a predecessor of Austin, reduced the suspension to only 8 hours. In the Court's view, the alleged misconduct at issue was not of comparable seriousness to the alleged misconduct here. *Cf. Kendrick*, 20 F.3d at 1233 (concluding that comparator evidence did not raise a genuine issue of material fact as to pretext, where the comparator did not have physical contact with the third person, whereas the plaintiff did, and explaining that "[a] company must be allowed to

36

exercise its judgment in determining how severely it will discipline an employee for different types of conduct."). This comparator evidence's evidentiary value is further diminished because Cage did not refuse to participate in a polygraph and the roles of Police Chief and City Administrator were filled by different individuals. Even viewing the evidence in Plaintiff's favor, this evidence fails to raise a genuine issue of material fact as to pretext.

### b.  *Police Chiefs as Comparators*

To the extent Plaintiff identifies former Chief Skinner and now-Chief Rodriguez as comparators for the Court's consideration, no reasonable jury could consider them similarly situated. To begin, a Police Chief is positioned much higher in the CPD hierarchy than a dispatcher, with different responsibilities, qualifications, and employment circumstances. *See Ibrahim*, 994 F.3d at 1198 (explaining that to determine whether a factfinder could reasonably consider the plaintiff and a proposed comparator similarly situated, the court should "consider the two employees' responsibilities and qualifications"). Moreover, a Police Chief and dispatcher do not share the same supervisors, and Plaintiff has presented no evidence that they are subject to the same standards governing performance evaluation. *See Aramburu*, 112 F.3d at 1404. Notably, when a Police Chief is involved in alleged misconduct, it is the City Administrator's role to initiate an investigation, whereas it is the Police Chief who initiates investigations into alleged misconduct by CPD employees.

Even if the record reveals disparate treatment of Police Chiefs accused of sexual misconduct as compared to lower-level CPD employees accused of sexual misconduct, that alone fails to raise an inference of pretext. Indeed, there are nondiscriminatory explanations for such a discrepancy that can be attributed to the Police Chief's position within the CPD hierarchy and to different oversight mechanisms. *See Kendrick*, 220 F.3d at 1232 ("Differences in treatment that

are . . . explained by a nondiscriminatory motive will not sustain a claim of pretext."). In short, the evidence Plaintiff presents of alleged sexual misconduct by individuals serving in the role of Police Chief fails to raise a genuine issue of material fact as to pretext.

### c.  Comparator Evidence During Rodriguez's Administration

In contrast to the other comparators whom Plaintiff identifies, the final two were both CPD employees who, like her, were subject to the disciplinary decision-making of Chief Rodriguez and City Administrator Austin at the time of their alleged misconduct. First, in January 2025, Chris Caron, the same officer who previously resigned for having on-duty sex with a gas station attendant, was reprimanded for leaving his jurisdiction while on duty to engage in "courting behavior" with a female outside of Carlsbad. This time, Caron received a 40-hour suspension. Although Caron had the same disciplinary decisionmakers as Plaintiff and was subject to the same policies, without additional details as to his alleged misconduct, there is no indication that Caron's off-premises "courting behavior" was of comparable seriousness to the alleged on-premises sexual misconduct alleged here. *See Elmore v. Capstan, Inc.*, 58 F.3d 525, 530 (10th Cir. 1995) ("When comparing the relative treatment of similarly situated . . . employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of 'comparable seriousness.'"). Nor is there any allegation that Caron refused to participate in a mandatory polygraph. This comparator evidence too is insufficient to permit an inference that the true explanation for Plaintiff's termination was gender discrimination.

The Court reaches the same conclusion with respect to Plaintiff's final comparator, Rory Castaneda, who, in December 2024, was required to participate in counseling after "pok[ing] and tickl[ing]" a female community service officer. Because poking and tickling a coworker are not of comparable seriousness to the conduct of which Plaintiff was accused, and because there is no

evidence that Castaneda was ordered to undergo a polygraph examination but refused, this comparator evidence fails to create a genuine issue of material fact as to pretext.

Plaintiff's comparator analysis is noticeably dismissive of the similarly situated male CPD employee alleged to have engaged in the *same conduct* and subject to the *same IA investigation*: Omar Lopez. Though Plaintiff may try, the Court cannot ignore a comparator who was, concurrently with Plaintiff, treated equally for similar conduct of comparable seriousness. *See English*, 248 F.3d at 1012. Like Plaintiff, Lopez was alleged to have engaged in sexual misconduct on CPD premises. Like Plaintiff, Lopez was directed to submit to a mandatory polygraph examination, and like Plaintiff, he refused. After a brief change of heart when Lopez temporarily agreed to participate in the polygraph, Lopez ultimately met with Chief Rodriguez, advised that he would *not* submit to the polygraph, and resigned from his position as a CPD Officer. In the interim, Rivera left open Lopez's IA investigation pending the results of his polygraph. In his findings, Rivera determined that both Plaintiff and Lopez were deceitful and violated CPD policies governing sexual misconduct and professional standards of conduct and that Plaintiff had additionally violated CPD policies governing cooperation with investigations by refusing to submit to a polygraph. And in a post-resignation memorandum, albeit undated, Chief Rodriguez explained that "[h]ad Officer Lopez remained employed" by CPD, rather than having resigned, "the appropriate disciplinary action" for his policy violations "would have been discharge."

Plaintiff contends that the undisputed facts before the Court give rise to a reasonable inference that Lopez was merely "collateral damage," because "[o]nce Prell and by extension Rodriguez went after Plaintiff, they had to go after Lopez, too." Dkt. No. 93 at 32. According to Plaintiff, there was no effort to investigate Lopez, despite his alleged confessions, until Prell began investigating her. *Id*. Finally, Plaintiff disputes Defendant's contention that Lopez received "equal

treatment," arguing that Lopez instead received "extra attention" that she did not. *Id.* at 32–33. In support, she describes efforts by Rivera to persuade Lopez to take the polygraph and a "private audience" with Chief Rodriguez in which the Chief offered advice to Lopez in Spanish. *See* Dkt. No. 93 at 33 (citing Dkt. No. 83, Ex. 3, at A.27–A.28; Dkt. No. 93, Ex. B.1, at 191:25–194:23).

But even viewing the facts in Plaintiff's favor, the record suggests that the differences in how the disciplinary phase played out for Lopez and Plaintiff were a product of differences in Lopez's *response* to the investigation rather than Defendant treating him more favorably than Plaintiff. Rivera issued warnings to Plaintiff about the consequences of refusing to submit to a polygraph similar to those issued to Lopez, but, unlike Lopez, there is no evidence that Plaintiff wavered in her refusal to take a polygraph or that she requested a meeting with Chief Rodriguez to explore the option of resigning prior to completion of the IA investigation. What's more, Plaintiff again refused to undergo a polygraph when City Administrator Austin offered her another opportunity at the pre-determination hearing. No reasonable jury could infer from the evidence Plaintiff presents that gender discrimination motivated Defendant to terminate Plaintiff but not Lopez.

In sum, the undisputed facts in this case indicate there are relevant and substantial differences in either the circumstances or alleged misconduct of each of Plaintiff's proposed comparators and those of Plaintiff. Lopez, on the other hand, is similarly situated to Plaintiff, was accused of the same misconduct, and the treatment he received from Defendant did not differ in any material respect. Perhaps most significantly, the parties agree that there is no evidence in the record of any CPD employee other than Plaintiff and Lopez who, when faced with allegations of sexual misconduct, refused a mandatory polygraph but did not resign or face termination. *See* Hr'g at 12:23:45–12:24:26, 12:30:38–12:31:02.

Ultimately, adding up the incongruities in Plaintiff's comparator evidence and the deficiencies in her other pretext evidence, the Court concludes that she has failed to put forth sufficient evidence to create a genuine issue of material fact on the issue of pretext, and Defendant is thus entitled to summary judgment on her Title VII claim.

### D. Defendant has demonstrated that it is entitled to summary judgment on Plaintiff's Equal Protection claim.

The parties agree that if the Court grants Defendant's Motion as to Plaintiff's Title VII discrimination claim, her Equal Protection claim fails as well. *See* Dkt. No. 83 at 19; Dkt. No. 93 at 34. Indeed, Plaintiff's Equal Protection claim requires a showing that "a specific officer or officers of [the City] . . . *intentionally* discriminate[d] against [her] because of her gender before she can attribute any fault to [the City] as a whole." *See Bird v. W. Valley City*, 832 F.3d 1188, 1208 (10th Cir. 2016). Thus, because the Court determines above that Plaintiff cannot raise a genuine issue of material fact as to whether she was the victim of intentional discrimination on account of her gender, she is unable to establish an Equal Protection claim under 42 U.S.C. § 1983. *See id.* (concluding that, because the plaintiff failed to provide sufficient evidence from which a reasonable factfinder could conclude that the city's stated reason for terminating her was pretextual for purposes of her Title VII claim, her Equal Protection claim failed for the same reason). Accordingly, the Court grants Defendant summary judgment on Plaintiff's Equal Protection claim.

### E. Having resolved Plaintiff's federal claims, the Court remands her remaining state claims for resolution by the state court.

In light of the Court's determination herein that Defendant is entitled to summary judgment on Plaintiff's Title VII and § 1983 claims, two state law claims remain: Plaintiff's NMHRA and NMWPA claims. This raises the question of whether the Court should resolve the still-pending

summary judgment motions challenging those claims or leave them to the state court to decide their merits on remand.

The Court's jurisdiction in this removed case was based on its federal question jurisdiction. Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." A district court, however, "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). "When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (quoting *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998)) (emphasis added). Indeed, federal courts must avoid rendering "[n]eedless decisions of state law . . . both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

Here, if the Court were to exercise supplemental jurisdiction over Plaintiff's NMHRA and NMWPA claims going forward, its summary judgment decision on those claims would not create binding precedent for New Mexico courts. More importantly, this Court is not in the best position to predict how the New Mexico legislature intended for the NMWPA to operate or to apply the Act to the facts at hand. On the other hand, considerations of judicial economy give the Court some pause, as trial is swiftly approaching, and the Court now enjoys substantial familiarity with the facts and legal issues that remain in this case. But even so, proceeding in state court on Plaintiff's state claims will necessitate few duplicative efforts, as the parties' *Daubert* motions are fully

42

briefed and ready for decision, the Court has not ruled on the parties' recently filed motions in limine, and the Court has not yet rendered any evidentiary rulings for purposes of trial. Moreover, it is not uncommon for a federal court to remand a state law claim or claims following the summary judgment stage, and indeed, the Tenth Circuit has at times *reversed* district courts for failing to do so. *See, e.g.*, *Birdwell v. Glanz,* 790 F. App'x 962, 964 (10th Cir. 2020) (reversing district court's decision to exercise supplemental jurisdiction over state law claim following grant of summary judgment on federal claims); *Aery v. Bd. of Cnty. Comm'rs of Tulsa Cnty.*, 696 F. App'x 360, 361 (10th Cir. 2017) (reversing district court for granting summary judgment on a state tort claim after dismissal of all federal claims); *Brooks*, 614 F.3d at 1229–30 (finding that district court erred in granting summary judgment against plaintiff on state tort law claim because only the state law issue was left for decision).

Having weighed the relevant considerations, the Court ultimately concludes that, even at this late stage, Plaintiff's state claims are better suited for state court. *See Merrifield v. Bd. of Cnty. Comm'rs for Cnty. of Santa Fe*, 654 F.3d 1073, 1086 (10th Cir. 2011) (explaining that "the interest in comity—leaving to the states to decide novel questions of state-law—clearly predominate[d]"); *Gibbs*, 383 U.S. at 726 ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."); *Bd. of Cnty. Comm'rs v. Geringer*, 297 F.3d 1108, 1115 n.6 (10th Cir. 2002) ("district courts should dismiss state claims without prejudice after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial"). Accordingly, the Court exercises its discretion under 28 U.S.C. § 1367(c)(3) to decline to exercise supplemental jurisdiction over Plaintiff's state claims.

## VI.   CONCLUSION

For the foregoing reasons, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's Title VII and § 1983 Equal Protection claims. In addition, the Court declines to exercise supplemental jurisdiction over Plaintiff's NMHRA and NMWPA claims.

**IT IS THEREFORE ORDERED** that *Defendant City of Carlsbad's Motion and Memorandum in Support for Summary Judgment for Plaintiff's Title VII Violations, New Mexico Human Rights Act Violations, and Violation of the Fourteenth Amendment Equal Protection Clause Under Section 1983 Claims* (Dkt. No. 83) is **GRANTED** to the extent set forth above.

**IT IS FURTHER ORDERED** that Plaintiff's state law claims are remanded to the Fifth Judicial District Court, Eddy County, State of New Mexico.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***